## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KENYATTA BROWN, #K79185,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. 3:20-cv-01348-SMY** |
| | ) | |
| **JOHN DOE 1,** | ) | |
| **JOHN DOE 2,** | ) | |
| **JOHN DOE 3,** | ) | |
| **JOHN DOE 4,** | ) | |
| **JOHN DOE 5,** | ) | |
| **JOHN DOE 6,** | ) | |
| **JOHN DOE 7,** | ) | |
| **JANE DOE 1,** | ) | |
| **MARY WILSON,** | ) | |
| **CHILDS,** | ) | |
| **BONER,** | ) | |
| **WARDEN JONES,** | ) | |
| **WARDEN WILLS,** | ) | |
| **WARDEN LAWRENCE,** | ) | |
| **ROB JEFFREYS,** | ) | |
| **LIEUTENANT GEE,** | ) | |
| **MAJOR ROLAN,** | ) | |
| **FRAZIER,** | ) | |
| **C/O ESTES,** | ) | |
| **SERGEANT BRANT,** | ) | |
| **SERGEANT HARRIS,** | ) | |
| **COUNSELOR RICHMOND,** | ) | |
| **E. CARTER,** | ) | |
| **H. PRICE,** | ) | |
| **JEFF MULHOLLAND,** | ) | |
| **KELLY PIERCE,** | ) | |
| **AMY BURLE,** | ) | |
| **DEBBIE KNAUER,** | ) | |
| **DAVID WHITE,** | ) | |
| **DOUG CAMPBELL, and** | ) | |
| **YVETTE BAKER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**YANDLE, District Judge:**

Plaintiff Kenyatta Brown, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center ("Menard"), filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights.  This case is now before the Court for preliminary review of the Complaint under 28 U.S.C. § 1915A.  Any portion of the Complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant must be dismissed.  28 U.S.C. § 1915A(b).

## The Complaint

Plaintiff makes the following allegations in his Complaint (Doc. 1):  Plaintiff has grown his hair into dreadlocks as part of the Nazirite vow, which prohibits cutting of hair.  A watch officer at Stateville told Plaintiff that his dreadlocks are permitted at all IDOC facilities.  Because he was pending transfer to Menard, Plaintiff asked about Menard's practice of cutting inmates' dreadlocks upon arrival at that facility.  The Stateville officer told him that IDOC sent a cease order to all facilities that were deeming dreadlocks "unsearchable" and cutting them.  The officer also told Plaintiff that Menard can no longer deem dreadlocks "unsearchable" and that prior to transfer, a lieutenant would search his dreadlocks on camera to prove that his hair is searchable.

Plaintiff was transferred to Menard on January 7, 2020 and admitted to the health care unit on suicide watch.  During processing the next day, John Doe 1 asked Plaintiff what his position was on his dreadlocks.  Plaintiff relayed what the Stateville officer had told him.  John Doe 1 told him the information was false and scheduled an appointment for Plaintiff's hair to be cut.  Hours later, an officer came to Plaintiff's cell to escort him to the barbershop, but Plaintiff refused.  John Doe 2 (described as a Major of Security) and other officers came to his cell and told him in a threatening manner that he had to cut his hair.  Plaintiff told them he knew about the cease order.  John Doe 2 and the other officers walked away saying "alright" as if to say "have it your way

2

then."  Later that day, Mary Wilson from the mental health department came to Plaintiff's cell under the guise of conducting a mental health exam because he was on suicide watch and told Plaintiff "you know you have to cut your hair."

Plaintiff was escorted by C/O Porter back to his housing unit on January 10, 2020 where John Doe 1 was waiting to speak to him.  John Doe 1 told him that he had spoken to Warden Jones who told him to explain to Plaintiff that he will not be allowed to walk around his facility like a "thug" and if he refused to cut his dreadlocks, he would not get any visits and staff will eventually "hook him up" (set him up).  Plaintiff told John Doe 1 that he would follow the rules and refused to be bullied.  John Doe 1 stated Plaintiff's family had been calling about seeing him and Chicago was a long way to drive to be turned away and he should think about that.

On January 13, 2020, Plaintiff spoke with Sergeant Wine about the rule change regarding dreadlocks.  Sergeant Wine responded, "Menard not gonna abide by that."  On January 14, 2020, Plaintiff told Internal Affairs Officer Child about the harassment he was experiencing with his dreadlocks and asked for protection out of fear for his well-being.  Childs pretended not to know about the "no-cut" memorandum.  Also on that day, Correctional Officer John Doe 3 yelled at Plaintiff, "I got scissors for that hair."

During an interview with Internal Affairs Officer Boner, Plaintiff pleaded for an investigation into the harassment and threats he was enduring.  Boner pretended not to know about the "no-cut" memorandum and advised Plaintiff to write the Warden.  Plaintiff wrote Warden Jones detailing the harassment and threats relayed by John Doe 1 that purportedly came from Warden Jones but he did not receive a response.

On January 15, 2020, Plaintiff wrote about the foregoing in a grievance and requested proof of the "no-cut" memorandum, assurance that his visits would be allowed, protection from

retaliation, and a transfer.  Counselor Richmond reviewed the grievance and informed Plaintiff only that he was in no danger of disciplinary action at the moment.  Richmond refused to assure Plaintiff he could have his visits without issue, did not provide a copy of the "no-cut" memorandum, and did not investigate the harassment and threats.  Grievance Officer Jeff Mulholland reviewed the grievance and refused to conduct an investigation into the harassment and threats.  Mulholland stated Plaintiff's dreadlocks were "unsearchable" and implied he should cut his hair for a contact visit.  Warden Jones concurred in the denial of the grievance.  Amy Burle of the ARB denied the grievance without conducting any investigation and claimed to be unable to substantiate the harassment.  IDOC Director Jeffreys concurred in the denial being fully aware that Menard prison officials were fighting the decision to stop cutting dreadlocks and that Plaintiff, being the only inmate in general population with dreadlocks, likely would be suffering some sort of hardship for choosing to keep his dreadlocks.

On January 31, 2020, Internal Affairs Sergeant John Doe 4 made a video recording of Plaintiff's dreadlocks.  John Doe 4 stated that Plaintiff could hide a shank in his hair and so he would only be allowed no contact visits.  Plaintiff asked why he would only be a security threat in the visiting room and not elsewhere in the facility.  John Doe 4 stated it was not his call and he was doing as he was told.  Plaintiff offered to allow John Doe 4 to demonstrate how a knife could be hidden in his hair, but John Doe 4 declined.

Correctional Officer Estes came to Plaintiff's cell on February 2, 2020 and notified Plaintiff that he had a visit but it was no contact.  After being escorted to the no contact visiting room, Plaintiff asked the correctional officer stationed in the room why he was not allowed contact visits. The office stated that per Internal Affairs Officer Frazier, Plaintiff could not have contact visits until he cut his dreadlocks.  Plaintiff was given three hours behind the glass with his visitor.

4

Plaintiff also experienced excessive delays in his incoming and outgoing mail and electronic messages to and from his girlfriend. Plaintiff wrote Internal Affairs Officer Childs concerning the delays around January 22, 2020. Childs came to his cell and told him his girlfriend's messages were not being held and suggested that she lied to him about sending the e-messages. Childs told Plaintiff's girlfriend that he had 13 messages waiting to be delivered and that none were from her suggesting she was lying and that Plaintiff had other women messaging him. Plaintiff received multiple e-messages on January 29, 2020 that had been held from his girlfriend. The messages had been held for weeks, proving Childs lied to cause turmoil in Plaintiff's relationship in retaliation for Plaintiff refusing to cut his dreadlocks.

On February 3, 2020, Plaintiff's cell was targeted in a tactical team search of designated cells throughout the facility. His cell was the only one in intake to be searched. Tactical Team Sergeant Brant made Plaintiff aware that he was chosen due to his refusal to cut his dreadlocks. Brant told Plaintiff the memorandum to cease the forcible removal of dreadlocks was "fake news" and went on to say "that hairstyle is unsearchable, so here's what's gonna happen, we gonna take you over and cut that shit out of your head and if you don't like it, you can go to segregation or do what you gotta do BOY."

Plaintiff had a visit on February 4, 2020 and again was only allowed no contact per internal affairs. This time, he was informed he would be subject to the same rules as inmates with loss of visit privileges due to disciplinary action which caps visit time at 2 hours. Plaintiff's grievance on the matter was denied.

An inmate with dreadlocks arrived from Pontiac on February 4, 2020 and was to be housed in the same unit as Plaintiff. The inmate was told he had three days to try and take his dreadlocks out. Once staff realized the inmate would see Plaintiff and discover that he could keep his

dreadlocks, they put him in a holding cell and told him he had to take out the dreadlocks immediately.  Correctional Officer John Doe 3 skipped over Plaintiff for shower so that the inmate would not see Plaintiff's dreadlocks.  The inmate chose to allow his dreadlocks to be cut when he was told he would go to segregation.  When the inmate returned he noticed Plaintiff's dreadlocks and stated to Plaintiff that he had been told he had to cut it.  Plaintiff told the inmate that they lied.  John Doe 3 heard the conversation.  The next day, Plaintiff was moved to a different cellhouse to prevent new inmates from seeing him and discovering that they did not have to cut their dreadlocks.  Although he had no job, Plaintiff was moved to the worker gallery based on the belief that working inmates would be less likely to grow dreadlocks for fear of losing their job in retaliation.  Plaintiff grieved it to no avail.

On February 10, 2020, Security Lieutenant John Doe 5 told Plaintiff that he had to cut his hair.  When Plaintiff made John Doe 5 aware that he could not be tricked and knew about the "no-cut" memorandum, John Doe 5 acted surprised as if he had never heard of the memo, despite the fact that all staff was given the memo.

On February 13, 2020, Plaintiff was asked by an inmate worker to show him how to twist his hair into dreadlocks.  While Plaintiff was assisting the inmate with twisting his hair, Sergeant Harris searched Plaintiff in an attempt to discourage him from twisting the inmates hair.  Plaintiff continued to twist the inmate's hair.  The next day, he was told he would be moved to another cellhouse in retaliation and to prevent him from continuing to be a motivation for others to grow dreadlocks.  Plaintiff was sent to an isolated cellhouse designated for elderly inmates that would be less likely to grow dreadlocks.

Plaintiff went to the visit room on February 16, 2020.  He asked the visit room correctional officer if he could be allowed to hug and kiss his visitor and then be given three hours in no contact

after he learned that inmates in administrative detention were allowed this privilege.  He was informed that per internal affairs, he could not hug or kiss his visitor and was only allowed a two-hour visit.  Plaintiff grieved the issue.  Counselor E. Carter, who was previously an internal affairs officer, refused to appropriately address the grievance and suggested Plaintiff cut his hair.  Carter attempted to thwart Plaintiff's effort to pursue contact visits by harping on an obvious typo in Plaintiff's grievance where he requested "noncontact" visits but meant to write "contact" visits (as could be easily interpreted from the summary of the complaint).  Carter concluded her review of two of Plaintiff's grievances, highlighting the typo as if it was grounds to deny the grievance. Grievance Officer Mulholland, Debbie Knauer, Warden Jones, Dave White, and IDOC Director Jeffreys concurred in the denial of Plaintiff's grievances without investigating, thereby further encouraging the Defendants to continue to harass Plaintiff.

After Carter concluded her counselor review of Plaintiff's grievances against internal affairs and others on February 13, 2020, Plaintiff's incoming and outgoing e-messages from all of his loved ones began to be delayed by Internal Affairs Officer John Doe 6.  Counselor H. Price denied Plaintiff's grievance requesting the e-message logs showing the delays in his messages caused by internal affairs.  Grievance Officer Mulholland concurred with Price's findings, as did Warden Jones, without investigating the matter.  Dave White of the ARB wrote that the basis for denial was "this office previously addressed this issue on 10/19/20."  Neither White nor anyone from his office addressed the issue on that date.  IDOC Director Jeffreys concurred with White's findings.

Warden Jones and Warden Wills used Plaintiff's legal calls and video visits as a tool to motivate Plaintiff to cut his hair.  On March 2, 2020, Correctional Officer Hall told Plaintiff he had a video visit but he would have to cut his hair to attend.  When he asked why he could not

have a video visit, Hall stated the Wardens and the Majors had a meeting and decided he would have to cut his hair to have no contact visits.  Plaintiff refused to cut his hair and his video visit was cancelled.

On March 3, 2020, Plaintiff was told he had a legal call scheduled for later that day but he would have to cut his hair to attend.  Later, Plaintiff was allowed to go to the gym where phones are located and called his attorney and explained the situation.  His attorney called Springfield and alerted them to the extreme limitations placed on Plaintiff due to his refusal to cut his dreadlocks.  Springfield called the facility and forced them to allow Plaintiff to attend his legal call.  Plaintiff was allowed to go to his legal call but not his mental health appointment scheduled the same day.  Plaintiff was escorted to his legal call in handcuffs even though he was not in segregation.

Plaintiff's fiancé contacted the Warden's secretary and Springfield on March 3, 2020 concerning the cancelled video visit.  Both Springfield and the Warden's secretary told Plaintiff's fiancé that Plaintiff should have been allowed to have a video visit and that they were told Plaintiff voluntarily refused his visit.  After Plaintiff's family and attorney continued to call Springfield, Plaintiff was allowed to attend no contact events.

From late February to mid-March 2020, Plaintiff's institutional mail and legal mail from the Circuit Clerk was being unwarrantedly delayed, which caused Plaintiff to make late court filings.  Plaintiff grieved the issue.  Internal Affairs Lieutenant Gee denied holding Plaintiff's legal documents.  Although Plaintiff provided exhibits substantiating his claim of receiving his legal and institutional mail late, Counselor Price, Grievance Officer Mulholland, and Warden Jones recommended his grievance be denied rather than taking any steps toward preventing the issue from persisting.  Lieutenant Gee and/or other internal affairs Defendants continued to hold Plaintiff's mail, including vital court filings.  The mail delays were the cause of an order sent to

Plaintiff months late and resulted in Plaintiff's civil case being dismissed.

Plaintiff received mail with the word "fag" and a smiley face written on it by an unknown staff member on April 16, 2020,.  He grieved the issue.  He wrote Counselor Price on April 28, 2020 to inquire about the grievance because he had not received a receipt.  When Counselor Price informed Plaintiff that she had not received the grievance, he knew someone had destroyed it.  He rewrote it on May 1, 2020.  Kelly Pierce refused to accept the grievance because it was on a copied form even though Plaintiff had obtained the grievance form from staff.  Debbie Knauer of the ARB refused to address the merits of the grievance, allowing the issue to persist.

Plaintiff was on a video visit with his then fiancé on June 28, 2020 and directed her to take a "screen shot" of him, which she did.  The monitoring officer then ended the visit citing a violation of video visit rules due to the screen shot.  Plaintiff asked to see the visit room rules that cites taking a screen shot as a violation.  The officer acknowledged that no video visit rules were posted nor printed anywhere.  Two days later, Plaintiff was told his fiancé was permanently banned from video visits and in person visits at all IDOC facilities due to her taking the screen shot.

After reviewing the visiting rules in the orientation manual which included no such rule, Plaintiff wrote Counselor Price and explained the incident, asked for the rules governing the video visit, and emphasized he had not received a write up for it.  Price responded that Plaintiff's visitor is told the rules and refused to send Plaintiff the rules or advocate for Plaintiff's due process rights.  Plaintiff wrote Counselor Price another letter pleading for her as his counselor to send him the visit rules since they were not in the inmate orientation manual.  Price wrote back "the rules aren't for you."  Price still refused to send Plaintiff a copy of the rules.  Plaintiff wrote to the prison law library and received a copy of the video visit rules which were vague and failed to cover screenshot/picture taking.

Subsequently, Plaintiff described the video visit incident to Major Rolan and Lieutenant John Doe 7.[1]  Both were aware of the incident.  Plaintiff stated his due process rights were being violated by punishing him for a rule not posted in the visit room or listed in the rules and punishing him without a disciplinary report and a hearing. They were shocked to learn of the permanent ban placed on Plaintiff's visitor by Warden Lawrence.  Major Rolan told Plaintiff he would speak with Warden Wills regarding the matter.

Plaintiff's girlfriend spoke with Counselor Price on July 8, 2020 and told her that the rules did not cover screen shots and she did not know it was a violation.  Price told her the rules prohibit video recording, which is the same.  Plaintiff's sister also spoke to Counselor Price that day and told her that Plaintiff was being mistreated because he refused to cut his dreadlocks.  Price stated Plaintiff's hair is unsearchable and against the rules.  Plaintiff's sister reminded Price that the rule about dreadlocks had changed and Plaintiff's hair is searchable which is why the facility is barred from cutting dreadlocks.  Price indicated she did not wish to discuss the issue of Plaintiff's hair any further.

Major Rolan came to Plaintiff's cell on July 9, 2020 and informed him that after investigating, he discovered that the rules were not posted for inmates to see in the visit room and although the rules are explained to visitors, they are given the option to have them read to them by the video monitoring officer.  Plaintiff asked why it was not mandatory for the monitoring officer to explain the rules to visitors prior to every visit.  Major Rolan stated that monitory officer, Correctional Officer Jane Doe 1,[2] gave Plaintiff's visitor the option to have the rules read because she was a frequent visitor.  Major Rolan also stated that he had the rules posted in the visit room and that Plaintiff's visitor would only be banned for a year.  Plaintiff stated the posting of the rules

---

[1] Plaintiff referred to the individual labeled as John Doe #7 as Defendant #8.
[2] Plaintiff referred to the individual labeled as Jane Doe 1 as Defendant #7.

after the incident was an admission of guilt and should warrant a lift on the ban.  Plaintiff showed Major Rolan the document signed by Warden Lawrence stating the ban was permanent.  Major Rolan stated he would discuss the issue with Warden Wills.  Plaintiff attended a video visit with his mom on July 11, 2020 and noticed each video visit booth had posted rules specifying picture taking and screen shots as a violation.

After some time had passed, Plaintiff spoke with Major Rolan concerning his promise to speak with Warden Wills about the visitor ban.  Major Rolan stated Warden Wills agreed that Plaintiff's due process rights were violated and that Plaintiff's banned visitor should write him. Plaintiff spoke with Warden Wills about the incident on August 13, 2020.  Warden Wills agreed Plaintiff's due process rights were violated and told Plaintiff to write him and have his banned visitor write to him as well and explain what occurred and he would lift the ban.  Plaintiff explained that he lost his fiancé due to the permanent ban and could not get her to write any more letters to the facility.  He stated that if the ban was lifted, he might have a shot at getting her back.  He told Warden Wills that he knew the ban was done in retaliation for his refusal to cut his dreadlocks and the proof was shown in how he was treated differently than other inmates.  He stated he was an A-grade inmate with no prior violations in the facility but segregation inmates were treated better than him.  He also told Warden Wills that his fiancé was really his only visitor and if she wasn't reinstated, it would play right into the intent of the staff seeking retaliation for his dreadlocks. After listening to Plaintiff, Warden Wills told him to write him a reminder concerning the incident and he would take care of it.  Plaintiff wrote to Warden Wills about the visitor ban in late August/early September but the ban has not been lifted and Plaintiff has no relationship with his former fiancé because of the ban.

Plaintiff put Menard officials on notice concerning his religious ties to his hair in January

11

2020 and again in May 2020.  Plaintiff notified them he was a Christian that took the Nazirite vow that mandates that he allow his hair to grow.  He also explained this to each Defendant when he was given an ultimatum concerning cutting his hair or losing a privilege or right (such as a legal call or visit).  Plaintiff came extremely close to violating his vow in order to relieve the pressure from the Defendants and to receive the privilege of contact visits provided to comparable inmates.

Based on the allegations in the Complaint, the Court designates the following claims in the *pro se* Complaint:

| | |
|---|---|
| Count 1: | First Amendment free exercise of religion claim against Warden Jones, Warden Wills, John Doe 4, Estes, and Frazier for limiting Plaintiff to no-contact visits because of his refusal to cut his dreadlocks. |
| Count 2: | First Amendment free exercise of religion claim against Warden Jones and Warden Wills for denying Plaintiff legal visits and video visits  because of his refusal to cut his dreadlocks. |
| Count 3: | First Amendment free exercise of religion claim against Warden Lawrence for permanently banning one of Plaintiff's visitors because of his refusal to cut his dreadlocks and Warden Wills for refusing to lift the ban. |
| Count 4: | Religious Land Use and Institutionalized Persons Act claim against Warden Wills for limiting Plaintiff to no-contact visits because of his refusal to cut his dreadlocks, denying Plaintiff legal visits and video visits  because of his refusal to cut his dreadlocks, and refusing to lift the permanent ban on one of Plaintiff's visitors. |
| Count 5: | First Amendment retaliation claim against Childs for delaying Plaintiff's incoming and outgoing e-messages in response to Plaintiff's refusal to cut his dreadlocks. |
| Count 6: | First Amendment retaliation claim against Gee for delaying Plaintiff's mail in response to Plaintiff's refusal to cut his dreadlocks. |
| Count 7: | First Amendment retaliation claim against Warden Jones, Warden Wills, John Doe 4, Estes, and Frazier for denying Plaintiff contact visits in response to Plaintiff's refusal to cut his dreadlocks. |

Count 8:  First Amendment retaliation claim against Brant for the shakedown of Plaintiff's cell in response to Plaintiff's refusal to cut his dreadlocks.

Count 9:  First Amendment retaliation claim against John Doe 6 for delaying Plaintiff's incoming and outgoing e-messages in response to Plaintiff's refusal to cut his dreadlocks.

Count 10:  First Amendment retaliation claim against Warden Jones and Warden Wills for denying Plaintiff legal calls and video visits in response to Plaintiff's refusal to cut his dreadlocks.

Count 11:  First Amendment retaliation claim against Warden Lawrence for banning visits from Plaintiff's girlfriend/fiancée in response to Plaintiff's refusal to cut his dreadlocks and Warden Wills for refusing to lift the ban.

Count 12:  First Amendment retaliation claim against Harris for searching Plaintiff without cause and John Doe 3 and Harris for having Plaintiff moved to a different cellhouse in response to Plaintiff's refusal to cut his dreadlocks and discussing dreadlocks with other inmates.

Count 13:  First Amendment retaliation claim against Rolan, John Doe 7, Jane Doe 1, Warden Lawrence, Warden Wills, and Price for their part in Plaintiff's fiancée being banned for violating an unknown rule in response to Plaintiff's refusal to cut his dreadlocks.

Count 14:  Eighth Amendment cruel and unusual punishment claim against John Doe 1, John Doe 2, Wilson, John Doe 3, Brant, John Doe 5, and Warden Jones for intimidating, threatening, and pressuring Plaintiff to cut his dreadlocks.

Count 15:  First and/or Fourteenth Amendment claim against Warden Jones, Richmond, Mulholland, Burle, IDOC Director Jeffreys, Carter, Knauer, White, Price and Pierce for denying Plaintiff's grievances.

Count 16:  First and/or Fourteenth Amendment failure to investigate claims against Childs, Boner, Warden Jones, Richmond, Mulholland, Carter, Burle, Knauer, White, IDOC Director Jeffreys, Price, and Pierce for failing to investigate Plaintiff's complaints.

Count 17:  First Amendment free speech claim against Childs for a continuing pattern and repeated occurrences of interference with, and delaying, Plaintiff's mail.

Count 18:    First Amendment free speech claim against Gee for a continuing pattern and repeated occurrences of interference with, and delaying, Plaintiff's mail.

Count 19:    First Amendment free speech claim against John Doe 6 for a continuing pattern and repeated occurrences of interference with, and delaying, Plaintiff's mail.

Count 20:    First and/or Fourteenth Amendment denial of access to courts claim against Gee for interference with, and delaying, Plaintiff's mail resulting in dismissal of a civil action.

Count 21:    Fourteenth Amendment due process claim against Rolan, John Doe 7, Jane Doe 1, Warden Lawrence, Warden Wills, and Price for their roles in Plaintiff's fiancée being banned for violating an unknown rule without giving Plaintiff a disciplinary hearing.

Count 22:    Fourteenth Amendment racial discrimination claim against all Defendants for the actions set forth in Counts 1 – 21.

Any claim that is mentioned in the Complaint but not addressed in this Order is dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.[3] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face.").

## **Preliminary Dismissals**

Yvette Baker and Doug Campbell are named as defendants and included in Plaintiff's list of claims, but there are no factual allegations against those individuals. Pursuant to Rule of Civil Procedure 8, the Complaint must include a short, plain statement of the case against each individual. Merely naming a party in the caption of a Complaint is not enough to state a claim against that individual. *Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir. 1998). Further, to state a colorable § 1983 claim, a plaintiff must sufficiently allege that each defendant was personally involved in the deprivation of a constitutional right. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir.

---

[3] This includes allegations that are not associated with any specific defendant.

2014) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation"); *see also Pepper v. Village of Oak Park*, 430 F.3d 806, 810 (7th Cir. 2005) ("[T]o be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation."). Absent allegations describing what these individuals did or failed to do in violation of Plaintiff's constitutional rights, claims asserted against them cannot proceed; they will be dismissed without prejudice for failure to state a claim.

Additionally, Plaintiff refers to individuals in his statement of claim, including Sergeant Wine and Correctional Officer Hall, who are not named as defendants. Federal Rule of Civil Procedure 10(a) requires the names of all parties to be included in the case caption. Therefore, claims against any individuals not identified as defendants in the case caption are dismissed without prejudice. *See Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005) (holding *pro se* Complaint failed to state a claim against individual mentioned in body of Complaint but not specified in the caption).

## Discussion

### Counts 1-4

The Free Exercise Clause of the First Amendment forbids prison officials from imposing a substantial burden upon the free exercise of religion unless the burden is reasonably related to a legitimate penological interest. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). A burden may take the form of pressure to change, but "must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place 'significant pressure' on [the plaintiff] to 'forego religious precepts' or to engage in 'religious conduct.'" *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006) (internal citation omitted).

Plaintiff will be allowed to proceed on this First Amendment free exercise of religion claim

15

in Count 1 against Warden Jones, Warden Wills, John Doe 4, C/O Estes, and Internal Affairs Officer Frazier, in Count 2 against Warden Jones and Warden Wills, and in Count 3 against Warden Lawrence and Warden Wills.

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits prisons receiving federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA provides broader protection for religious liberty than does the First Amendment.  *See Holt v. Hobbs*, 574 U.S. 352, 357 (2015).  Because the RLUIPA limits damages to injunctive or declaratory relief, the proper party is the supervisory government official responsible for ensuring that the injunctive relief is carried out. *See, Sossamon v. Texas*, 563 U.S. 277, 287 (2011); *Gonzalez v. Feinerman,* 663 F.3d 311, 315 (7th Cir. 2011) (finding that the warden of an institution is the appropriate party for injunctive relief).

Plaintiff may proceed on the RLUIPA claim in Count 4 against Warden Wills in his official capacity as the Warden of Menard Correctional Center.

**Counts 5-13**

Prison officials are prohibited from retaliating against inmates for filing grievances, exercising First Amendment rights, or otherwise complaining about their conditions of confinement. *See, e.g., Gomez v. Randle,* 680 F.3d 859, 866 (7th Cir. 2012).  To state a retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). "A complaint states a claim for retaliation when it sets forth a chronology of events from which retaliation may plausibly be inferred." *Zimmerman v. Tribble*,

226 F.3d 568, 573 (7th Cir. 2000).

The allegations that the defendants identified in Counts 5-13 engaged in various retaliatory acts against Plaintiff because he refused to cut his dreadlocks are sufficient to proceed on those claims.  Accordingly, the following retaliation claims will be allowed to proceed: Count 5 against Internal Affairs Officer Childs; Count 6 against Lieutenant Gee; Count 7 against  Warden Jones, Warden Wills, John Doe 4, C/O Estes, and Internal Affairs Officer Frazier; Count 8 against Brant; Count 9 against John Doe 6; Count 10 against Warden Jones; Count 11 against Warden Lawrence and Warden Wills; Count 12 against Sergeant Harris and John Doe 3; and Count 13 against Warden Lawrence and Warden Wills.  However, Count 13 will be dismissed against Major Rolan, John Doe 7, Jane Doe 1, and Counselor Price.

## Count 14

Allegations of verbal abuse and threats are generally insufficient grounds for relief under § 1983.  *See Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) ("[M]ost verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment.").  However, verbal harassment that causes physical or psychological pain may constitute cruel punishment under the Eighth Amendment.  *Beal*, 803 F.3d at 357-58.

Here, Plaintiff does not describe psychological pain or the type of verbal harassment sufficient to constitute cruel punishment.  Each defendant is only responsible for his or her actions, not the actions of others.  Therefore, Plaintiff fails to state an Eighth Amendment cruel and unusual punishment claim against John Doe 1, John Doe 2, Mary Wilson, John Doe 3, Brant, John Doe 5, and Warden Jones, and Count 14 will be dismissed.

## Count 15

"Prison grievance procedures are not mandated by the First Amendment and do not by their

very existence create interests protected by the Due Process Clause, and so the alleged mishandling of [a prisoner's] grievances by person who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *see also Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."). And, "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).  As such, Plaintiff fails to state a viable claim against the grievance officials for allegedly failing to investigate and/or denying his grievances.  Count 15 will be dismissed.

## Count 16

Prison officials incur no liability under § 1983 if they fail or refuse to investigate a prisoner's complaints or grievances. *See Watson v. Dodd*, No. 16-CV-1217-NJR, 2017 WL 120951, at *6 (S.D. Ill. Jan. 12, 2017); *Wilkins v. Illinois Dep't of Corr.* No. 8-cv-732-JPG, 2009 WL 1904414, at *9 (S.D. Ill. July 1, 2009).   Accordingly, Count 16 will be dismissed.

## Counts 17-20

Prisoners have a First Amendment right to both send and receive mail.  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  A valid claim requires demonstrating "a continuing pattern or repeated occurrences" of denial or delay of mail delivery.  *Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2002) ("Allegations of sporadic and short-term delays in receiving mail are insufficient to state a cause of action grounded upon the First Amendment."). Interference with a prisoner's mail by prison officials may also implicate the right of access to the courts.  *Kaufman v. McCaughtry*, 419 F.3d 678, 685-86 (7th Cir. 2005).

Plaintiff alleges that Childs, Gee, and John Doe 6 engaged in a pattern and/or repeated

occurrences of delaying delivery of his mail and that Gee's conduct caused his civil case to be dismissed.  These allegations are sufficient for the claims in Count 17 against Internal Affairs Officer Childs, Count 18 against Lieutenant Gee, Count 19 against John Doe 6, and Count 20 against Lieutenant Gee to proceed.

### Count 21

To state a procedural due process claim under the Fourteenth Amendment for alleged constitutional violations associated with disciplinary proceedings, a plaintiff must plead facts suggesting the state deprived him of a constitutionally protected interest in "life, liberty, or property" without due process of law.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  A court analyzing this claim in the context of prison disciplinary hearings must consider (1) whether there was a protected interest at stake that necessitated due process protections and (2) whether the disciplinary hearing was conducted in accordance with procedural due process requirements.  *Id.*

The permanent visitation ban for Plaintiff's fiancée does not implicate a liberty interest. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989); *Cherry v. McCaughtry*, 49 F. App'x. 78 (7th Cir. 2002) (inmate's temporary inability to visit his fiancé did not implicate a liberty interest); *see also, Billups v. Galassi*, 202 F.3d 272 (7th Cir. 2000) (visiting privileges with girlfriend could be permanently revoked without a hearing "or any other due process protection" because the denial of a specific visitor's privileges was "well within the terms of confinement ordinarily contemplated by a prison sentence").  Accordingly, Count 21 will be dismissed.

### Count 22

"Racial discrimination in the administration of state prisons violates the Equal Protection Clause of the Fourteenth Amendment." *Black v. Lane*, 824 F.2d 561, 562 (7th Cir.1987).  "A person bringing an action under the Equal Protection Clause must show intentional discrimination

against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Huebschen v. Department of Health & Soc. Servs.,* 716 F.2d 1167, 1171 (7th Cir. 1983) *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002). Thus, "[a]n inmate's subjective belief that he was unfairly treated, without more, does not state a viable equal protection claim." *Shelton v. Melvin*, No. 17 CV 50045, 2017 WL 951241, at *5 (N.D. Ill. Mar. 10, 2017) (citing *Huebschen v. Dep't of Health and Soc. Serv.*, 716 F.2d 1167, 1171 (7th Cir. 1983)).

Here, Plaintiff makes conclusory assertions that he was discriminated against, which are insufficient to state a claim. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements"); *Twombly*, 550 U.S. at 570 (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."). Moreover, when a Fourteenth Amendment equal protection claim is similar to a claim under another constitutional clause, courts will analyze the Complaint under the most "explicit source[s] of constitutional protection." *Graham v. Connor,* 490 U.S. 386, 395 (1989). As such, Fourteenth Amendment equal protection claims that are essentially duplicative of First Amendment free exercise claims are routinely dismissed. *See Conyers v. Abitz,* 416 F.3d 580, 586 (7th Cir. 2005). For these reasons, Count 22 will be dismissed.

### **Request for Injunctive Relief**

Plaintiff has filed a separate Motion for Preliminary Injunctive Relief (Doc. 4). Defendants are **ORDERED** to file a response to the motion within thirty (30) days of service.[4]

---

[4] Warden Wills, in his official capacity as the Warden of Menard Correctional Center, is the proper party for Plaintiff's request for injunctive relief in the Complaint. *See Gonzales v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

**Identification of Doe Defendants**

Warden Wills, in his official capacity as the Warden of Menard Correctional Center, is the proper defendant for purposes of responding to discovery aimed at identifying the unknown defendants. *See Rodriguez v. Plymouth Ambulance Serv*., 577 F.3d 816, 832 (7th Cir. 2009); Fed. R. Civ. P. 21. Guidelines for discovery will be set by the undersigned judge. Once the names of the unknown defendants are discovered, Plaintiff shall file a motion to substitute the newly identified defendants in place of the generic designations in the case caption and throughout the Complaint.

**Disposition**

The following claims will proceed: Count 1 against Warden Jones, Warden Wills, John Doe 4, C/O Estes, and Internal Affairs Officer Frazier; Count 2 against Warden Jones and Warden Wills; Count 3 against Warden Lawrence and Warden Wills; Count 4 against Warden Wills in his official capacity as the Warden of Menard Correctional Center; Count 5 against Internal Affairs Officer Childs; Count 6 against Lieutenant Gee; Count 7 against  Warden Jones, Warden Wills, John Doe 4, C/O Estes, and Internal Affairs Officer Frazier; Count 8 against Brant; Count 9 against John Doe 6; Count 10 against Warden Jones; Count 11 against Warden Lawrence and Warden Wills; Count 12 against Sergeant Harris and John Doe 3; Count 13 against Warden Lawrence and Warden Wills; Count 17 against Internal Affairs Officer Childs; Count 18 against Lieutenant Gee; Count 19 against John Doe 6; and Count 20 against Lieutenant Gee.

Counts 14, 15, 16, 21, and 22 are **DISMISSED without prejudice** for failure to state a claim for relief. Additionally, Defendants Yvette Baker, Doug Campbell, John Doe 1, John Doe 2, John Doe 5, John Doe 7, Jane Doe 1, Mary Wilson, Boner, Rob Jeffreys, Major Rolan,

Counselor Richmond, Counselor Carter, Counselor Price, Grievance Officer Jeff Mulholland, Kelly Pierce, Amy Burle, Debbie Knauer, and Dave White  are **DISMISSED without prejudice** and the Clerk of Court is **DIRECTED** to **TERMINATE** them as defendants.

A ruling on the Motion for a Preliminary Injunction (Doc. 4) is **DEFERRED** and Defendants are **ORDERED** to file a response to the motion within thirty (30) days of service.

The Clerk shall prepare for Childs, Warden Jones, Warden Wills (individual and official capacities), Warden Lawrence, Lieutenant Gee, Frazier, C/O Estes, Sergeant Brant, Sergeant Harris and, once identified, John Does 3, 4, and 6: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).  The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to Defendant's place of employment as identified by Plaintiff.  If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the Defendant, and the Court will require the Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.  This information shall be used only for sending the forms as directed above or for formally effecting service.  Any documentation of the address shall be retained only by the Clerk and shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).  Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit

Review Order.

Plaintiff is **ADVISED** that if judgment is rendered against him and the judgment includes the payment of costs under 28 U.S.C. §1915, he will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is further **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and the opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* Fed. R. Civ. P. 41(b).

Based on the allegations in the Complaint, the Clerk of Court is **DIRECTED** to **ENTER** the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

**IT IS SO ORDERED.**

**DATED:  May 17, 2021**          *s/ Staci M. Yandle*
                                                     **STACI M. YANDLE**
                                                     **United States District Judge**

### Notice to Plaintiff

The Court will take the necessary steps to notify the Defendants of your lawsuit and serve them with a copy of your Complaint. After service has been achieved, Defendants will enter an appearance and file an Answer to your Complaint. It will likely take at least **60 days** from the date of this Order to receive the Defendants' Answer, but it is entirely possible that it will take **90 days** or more. When Defendants have filed their Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for Defendants before filing any motions, to give the Defendants notice and an opportunity to respond to those motions. Motions filed before Defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.